# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-285V

|   |   |
|---|---|
| DIANE JANNI, as Personal Representative Of the Estate of JOSEPH JANNI,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: June 16, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On March 11, 2022, Diane Janni filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act") on behalf of her deceased husband, Joseph Janni. Petitioner alleges that Mr. Janni suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to him on September 25, 2019, which later resulted in his death on October 30, 2019. Petition at ¶ 8. I determined that Petitioner was entitled to compensation for Mr. Janni's GBS injury, but the parties were unable to resolve damages on their own, so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of $225,000.00 for Mr. Janni's actual pain and suffering.

## I.   Relevant Procedural History

As noted above, this case was initiated in March 2022. On December 1, 2022, Respondent filed his Rule 4(c) Report conceding entitlement, but denying that Petitioner should receive the statutory death benefit, since such a claim had not been submitted in a timely basis. ECF No. 14 at 1. Petitioner deferred to my resolution the question regarding whether her claim for the death benefit under the Act should be dismissed. ECF No. 16. I ruled in Petitioner's favor on the conceded GBS injury claim, but dismissed Petitioner's claim for the death benefit of $250,000.00 associated with Mr. Janni's death (under Section 15(a)(2) of the Vaccine Act) as untimely filed.[3] ECF No. 17.

Thereafter, the parties engaged in informal discussions to resolve damages, but were unable to do so, and I set deadlines for the filing of briefs addressing an appropriate award of compensation. ECF No. 26. On May 20, 2024, Petitioner filed a Brief on Damages requesting an award of $250,000.00 for Mr. Janni's pain and suffering as a result of his GBS. ECF No. 28. On July 5, 2024, Respondent filed a response Brief on Damages recommending that Petitioner should be awarded the lesser amount of $125,000.00. ECF No. 29.

Petitioner filed a Reply on July 22, 2024, and I subsequently scheduled this matter for a "Motions' Day" expedited hearing. ECF Nos. 32-34; Hearing Order (Non-PDF) filed May 12, 2025. The Motions' Day hearing took place on May 30, 2025. Minute Entry dated May 30, 2025.[4] After hearing argument, I made an oral damages determination. This Decision memorializes that determination.

## II.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such

---

[3] The Vaccine Act requires that "if a death occurred as a result of the administration of . . . a vaccine, no petition may be filed for compensation under the Program for such death after the expiration of *24 months from the date of death* . . . ." Section 16(a)(3) (emphasis added). Mr. Janni died on October 30, 2019. Ex. 5. The Petition was filed, however, on March 11, 2022, more than 28 months after Mr. Janni's death. ECF No. 1. And Petitioner had otherwise established no basis for equitable tolling of the limitations period.

[4] Michael Milmoe appeared on behalf of Petitioner, and Ryan Pyles appeared on behalf of Respondent. The transcript of the May 30, 2025 Hearing in this case was not filed as of the date of this Decision, but my oral ruling is incorporated by reference herein.

expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible

3

awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### III.     Prior SPU Compensation of GBS Pain and Suffering[5]

#### A.     Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, since SPU's inception ten years ago, 897 GBS cases have been resolved. Compensation has been awarded in the vast majority of cases (852), with the remaining 45 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[6] Agreement |
|---|---|---|---|---|
| **Total Cases** | *56* | *412* | *20* | *364* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $156,760.64 | $125,000.00 | $128,700.00 | $100,000.00 |
| **Median** | **$171,082.15** | **$162,940.13** | **$224,397.27** | **$150,000.00** |
| **3rd Quartile** | $186,457.51 | $244,193.98 | $380,028.33 | $221,250.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

#### B.     Adjudication of GBS-Associated Pain and Suffering

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[6] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases,

4

As of January 1, 2025, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded (with a lower sum, lower sum, $92,500.00, only awarded once). The remaining fifty-five (55) awards far exceeded $100,000.00. The first-quartile value is $153,750.00. The median is $167,500.00. The third-quartile value is $178,500.00. The largest award was $197,500.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 – 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). Id. The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." Id. at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." Id. at (c)(15)(III).[8]

---

these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[9] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is the long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to

---

[9] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5. Also worthy of consideration is the injury's impact on a petitioner's personal circumstances and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

### IV.     Overview of the Parties' Arguments

Petitioner argues that the legal standard for a pain and suffering award at the top of the Act's "cap" is supported by decisions in other GBS cases and consistent with the remedial purposes of the Act. ECF No. 28 at 11-24. She contends that "absent the $250,000.00 cap, this case would call for an overall award well in excess of $250,000." (*quoting Brustuen v. Sec'y of Health & Hum Servs.,* No. 90-3936V, 1992 WL 167284, at 2 (Fed. Cl. June 25, 1992)) and that

> [g]iven all that [Mr. Janni] went through in the weeks leading up to his death, [P]etitioner's award for pain and suffering in state court would likely far exceed the amount capped by statute. Given the Act's remedial purpose, and its requirement that awards be made in the spirit of generosity, [P]etitioner is entitled to a high award for past pain and suffering.

*Id.* at 24.

Respondent, in contrast, asserts that his proposed award is better supported by the relevant legal standard, and Program case law, specifically arguing

> [i]f [P]etitioner had timely filed her claim for purposes of the Vaccine Act's death benefit, then [R]espondent would be proffering a combined $375,000.00, which would include some measure of compensation to the survivors of the estate. And while Mr. Janni's course was very severe, the stark reality is that his pain and suffering lasted for twenty-two days. An award of $125,000.00 – or roughly $5,600 per day – fully recognizes that fact.

ECF No. 29 at 8.

7

### V.      Appropriate Compensation for Mr. Janni's Pain and Suffering

As a preliminary matter, I observe that the award for pain and suffering in this case is to provide compensation for the vaccinee (Mr. Janni) *only,* based on his demonstrated "actual and projected pain and suffering and emotional distress from the vaccine-related injury." Section 15(a)(4). Thus, even though it cannot be disputed that Petitioner and her greater family suffered extreme emotional distress as a result of his death, I cannot take into account their own experiences in calculating the award.

Of course, had Petitioner filed her claim within 24 months of Mr. Janni's death, she would have been entitled to a *separate and additional award* "death benefit award" under the Act of $250,000.00 – *automatically*, and hence without any evidentiary fact-finding or weighing required. Section 15(a)(2) (Compensation under the Program includes: "[i]n the event of a vaccine-related death, an award of $250,000 for the estate of the deceased."). But this did not occur.

As in all Vaccine Act cases, I analyze principally the severity and duration of Mr. Janni's injury in determining an appropriate award for his pain and suffering.[10] In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits or declarations, photographic evidence, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

Here the records shows that Mr. Janni, an 80-year-old retired husband and father, received a flu vaccine at Costco Pharmacy on September 25, 2019. Ex. 1 at 1. Mr. Janni began experiencing bilateral hand numbness, as well as elevated blood pressure, on October 7, 2019, and when the symptoms persisted the next day (October 8, 2019) he went to see his primary care physician. Ex. 3 at 105; Ex. 7 at 1. His primary care physician ordered labwork, assessed him with peripheral neuralgia, and advised to follow-up in three days. *Id.* at 107; Ex. 7 at 1. However, Mr. Janni's symptoms worsened and the next day (October 9, 2019) he went to the emergency department of the Maui Memorial Medical Center, where he was admitted and remained in the intensive care unit for 22 days until his death from GBS on October 30, 2019. Ex. 2 at 215-16.

Although Mr. Janni suffered from GBS for only 24 days after his symptoms commenced on October 7, 2019, there is no question that the severity of his GBS was unusually high – even in the context of GBS. Over the course of the 22 days Mr. Janni

---

[10] In this case, awareness of the injury is not disputed. The record reflects that prior to his death, Mr. Janni was a competent adult and aware of his injury.

spent in the ICU treating his GBS, he experienced multiple complications, including: acute respiratory failure, an inability to eat, an inability to communicate, a urinary tract infection ("UTI"), sepsis following the UTI, bedsores, and paresthesia, an inability to ambulate, and ultimately death. *See, e.g.,* Ex. 2 at 213-16, 224, 441-42, 446-47. His treatment while in the hospital included but was not limited to: IVIG treatment for five days or sessions; four plasmapheresis treatments; use of a BiPAP machine to assist with breathing; physical and/or occupational therapy; and ultimately palliative care. *See, e.g.,* Ex. 2 at 213-16, 220, 232. Additionally, Mr. Janni required the insertion of a PEG tube for feeding, and a PICC line placement. *See, e.g.,* Ex. 2 at 214, 216, 432, 657. Mr. Janni also received numerous medications to address his pain, insomnia, and anxiety, including lorazepam, Precedex, Oxycodone, Neurontin, topical Lidoderm, and Flexeril. Ex. 2 at 216.

Petitioner and Mr. Janni's daughters, Lynne Hunt and Carol Janni, filed sworn statements that describe in detail the pain and suffering he experienced over his final weeks of life. Exs. 7-9. Mr. Janni experienced difficulty just getting into the car when driven to the emergency department – he fell out of the bed on the morning of October 9, 2025 and could not independently stand, or sit up. Ex. 7 at 1. Petitioner had to pull her husband up onto a rolling chair which she strapped him on with a belt, and then wheeled him through the house to the garage where they struggled to get him into the car. *Id.* Ms. Hunt described how once hospitalized "paralysis rapidly overwhelmed [her dad's] extremities" and states "he could not move his arms, hands or legs." Ex. 8 at 1. Ms. Hunt explains that while he received fluids and nutrition by IV, he "was agonizingly hungry and thirsty," and begged her for her soda which she had to refuse. *Id.* Ms. Hunt states that Mr. Janni developed a "large bedsore which required rolling him from one side to the other every few hours" and that when staff performed this procedure "he would yell in agony." *Id.* Ms. Hunt describes how Mr. Janni was "unable to breathe", and "needed oxygen all the time". *Id.* at 2. Ms, Hunt further explains that his "oxygen mask caused an open wound [to form] on the bridge of his nose which made it difficult and painful for him to wear", but because he required the mask for oxygen the wound would just "kept getting worse." *Id.*

Ms. Hunt described Mr. Janni as a "brilliant Ph.D. scientist" whose inability to communicate as a result of his GBS "frustrated him immensely" and ultimately, he "completely lost his ability to express what he wanted and needed. Yet he still understood what we were saying to him. It was like a guessing game. . . . Dad was trapped in his own body." *Id.* at 2. Ms. Hunt states that Mr. Janni "knew he was dying . . . and there was nothing he could about it. He was upset and scared." *Id.* Ms. Hunt recalls how "[a] few days before [he] died, he became septic and then delirious. . . . The sounds coming out of him were eerie. It was constant whimpering, groaning, and gurgling." *Id.* Ms. Hunt states that during those final weeks "he got no rest, no comfort, and no peace. Dad died in agony, all because he was trying to do the right thing and get a flu shot." *Id.*

As I informed the parties during the expedited hearing, the question in this case is not whether Petitioner is entitled to *any* compensation for Mr. Janni's pain and suffering, but rather *what* amount of compensation is justified, based upon the facts of the case. This determination is not an exact science but more of an art. Based upon the record as a whole, I find that the severity and duration of Mr. Janni's GBS which ultimately resulted in his death warrant a significant pain and suffering award - although not quite at the level requested by Petitioner.

As discussed above, Mr. Janni's estate is not entitled to an award for his death – but rather the pain and suffering *he experienced* as a result of his GBS leading up to and including his death. The fact that Mr. Janni died as a result of his vaccine injury does not automatically equate to a pain and suffering award at the statutory maximum. Indeed, there are many circumstances imaginable in which an injured party's literal suffering prior to death was limited. A vaccinee who died very quickly due to an accident following an injury such as anaphylaxis, for example, would likely receive a pain and suffering award well below the statutory maximum. The fact of the death *itself* does not automatically counsel for an award at the statutory cap (even if it bears on the overall magnitude of the award).

In her brief, Petitioner cites four prior GBS damages cases – each awarding $180,000.00 in pain and suffering - but argues that Mr. Janni's GBS injury was more severe than the petitioners in those cases. ECF No. 28 at 19-22 (citing *Johnson v. Sec'y of Health & Human Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July, 20, 2018); *McCray v. Sec'y of Health & Hum Servs.,* No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Kresl v. Sec'y of Health & Hum Servs.,* No. 22-0518V, 2024 WL 1931498 (Fed. Cl. Spec. Mstr. April 1, 2024); and *Fedewa v. Sec'y of Health & Hum Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020).[11]

Respondent argues that his proposed "award of $125,000.00 is supported by Program precedent, in light of the very limited duration of pain and suffering here, however severe" and cites to the following decisions: *Kresl,* 2024 WL 1931498; *Wilson v. Sec'y of Health & Human Servs.*, No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec, Mstr. Oct. 5, 2021) (awarding $175,000.00 for actual pain and suffering); *Rastetter v. Sec'y of Health & Human Servs.*, No. 19-1840, 2023 WL 5552317 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (awarding $195,000.00 for actual pain and suffering); and *O'Donnell v. Sec'y of Health & Human Servs.*, No. 21-1508V, 2023 WL 9060699 (Fed. Cl. Spec. Mstr. Nov. 20, 2023) (awarding $190,000.00 for actual pain and suffering); and *Bayley v. Sec'y of Health &*

---

[11] Petitioner also cites to cases that have been informally resolved in the Program in support of her requested award. ECF No. 28 at 22-23. However, as discussed supra at note seven, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision.

*Human Servs.*, No. 21-1851V, 2024 WL 5656415 (Fed. Cl. Spec. Mstr. Mar. 7, 2024) (awarding $170,000.00 for actual pain and suffering).[12] ECF No. 29 at 5-7.

I find that both parties have offered reasonable case comparables, and acknowledge that no prior reasoned GBS decisions involve a vaccinee who died as a result of GBS (and who was also ineligible for the death benefit). Additionally, each award must be specific to the injured party's specific circumstances. In this case, Mr. Janni's injury did not persist for months, or even years – as seen in many GBS cases. And it did not demonstrably impact his subsequent life or professional/personal pursuits. But it is readily apparent that his pain and suffering while hospitalized for 22 days (as described above) was exceptionally severe. And while 22 days may not be a particularly long duration of time as a general matter – I find that is a long period of time to endure the circumstances Mr. Janni encountered, including contemplating the possible outcomes of his injury.[13]

In the end, and after reviewing the record and specific facts in this case, and considering the parties' arguments during the hearing, I find that $225,000.00 in compensation for past or actual pain and suffering is reasonable. This sum exceeds the amount that Respondent proposed, and is appropriately higher than the reasonably good comparable cases offered by the parties. I deem it to fairly reflect Petitioner's degree of suffering at the end of his life, and to fairly reflect the demonstrated severity of his injury.

This case raises the question of the nature of the relationship between the Act's fixed death benefit and the pain and suffering sum to be awarded to a decedent vaccinee. The latter, unlike the death benefit, is not fixed, and depends on a combination of evidence specific to a claimant and how that claimant's experience compares to similarly-situated individuals. I do not find herein that an injured party's pain and suffering award cannot take into account a vaccine-associated death (such that the failure to seek the death benefit forecloses consideration of such factors). But the fact of death *itself* does not automatically entitle a petitioner to the full amount of pain and suffering available under the Act either.

---

[12] This Decision was not publicly available at the time of the filing of Respondent's brief, therefore Respondent cited to the "slip opinion" in CM/ECF. ECF No. 29 at 6.

[13] The evidence does not wholly support the view that Mr. Janni's potential death was an absolute and foregone conclusion. One of Mr. Janni's providers noted during his hospitalization in regard to his "long term prognosis [to] anticipate [a] long recovery time frame with significant debilitation on the order of months to potentially years." Ex. 2 at 423.

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $225,000.00 represents a fair and appropriate amount of compensation for Mr. Janni's actual pain and suffering.**[14]

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $225,000.00 (representing pain and suffering) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[15]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.